IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 1:16CV1172 |
| | ) | |
| v. | ) | |
| | ) | |
| UNION SAVINGS BANK, and | ) | |
| GUARDIAN SAVINGS BANK, FSB, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## CONSENT ORDER

## I.      INTRODUCTION

The Order is submitted jointly by the parties for the approval of and entry by the Court simultaneously with the filing of the United States' Complaint in this action.  The Order resolves the claims of the United States that Union Savings Bank ("Union") and Guardian Savings Bank, FSB ("Guardian") (collectively, "Banks") have engaged in a pattern or practice of conduct in violation of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-3619, and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-169lf, by discriminating on the basis of race and color in the provision of residential real estate-related extension of credit.

There has been no factual finding or adjudication with respect to any matter alleged by the United States.  The parties have entered into the Order to resolve voluntarily the claims asserted by the United States in order to avoid the risks and burdens of litigation.  The parties agree that full implementation of the terms of the Order will provide a resolution of the allegations in the United States' Complaint in a manner consistent with the Banks' legitimate business interests.

1

## II.    BACKGROUND

Union is a State of Ohio chartered privately-held bank and Guardian is a federally charted privately-held bank. Both are headquartered in Cincinnati, Ohio. Although they share common ownership, their services are provided independently.

Union offers the traditional services of a financial depository and lending institution, including the receipt of monetary deposits and the financing of residential housing loans. As of December 31, 2015, its assets totaled over $2.7 billion. Union currently has twenty-nine (29) full-service branches, which include twelve (12) within the Cincinnati Metropolitan Statistical Area ("MSA"), seven (7) within the Columbus, Ohio MSA, six (6) within the Dayton, Ohio MSA, and one (1) within the Indianapolis, Indiana MSA. Guardian also offers the traditional services of a financial depository and lending institution, including the receipt of monetary deposits and the financing of residential housing loans. As of December 31, 2015, its assets were approximately $861 million. Guardian currently has eleven (11) full-service branches, which include nine (9) within the Cincinnati, Ohio MSA.

Based on its investigation, the United States' Complaint alleges, inter alia, that between 2010 and 2014, Union's and Guardian's policies and practices had the effect of denying or discouraging an equal opportunity to the residents of majority-African-American census tracts in the Cincinnati, Columbus, Dayton, and Indianapolis MSAs to obtain residential home loans on account of the racial composition of those tracts.

Under the provisions of the Order, Union and Guardian have committed themselves to a program designed to expand opportunities to meet the credit needs of residents located in majority-African-American census tracts. The Banks will make available and market their lending products and services in majority-African-American census tracts and will do so on no less favorable a basis than in majority-white tracts. The Banks will take all reasonable,

practicable actions, consistent with safety and soundness, to increase the level of their residential lending in majority-African-American census tracts, with the ultimate objective to ensure that the Banks offer mortgage lending services on an equal basis as they offer such services in majority-white census tracts. The plan to achieve this objective, detailed in subsequent sections of the Order, includes, but is not limited to, expanded physical presence, expanded community outreach, investment in the affected areas, and targeted advertising programs.

The United States appreciates the Banks' cooperation with the investigation. The United States believes that the Banks are appropriately committed to future compliance with the law, and have begun to take meaningful steps to improve access to credit in the African-American census tracts in their lending areas.

**STATEMENT OF UNION AND GUARDIAN**

Union and Guardian have a decades-long commitment to serving all communities in which they are located. While the Banks strongly deny the violations of law alleged by the United States, they do agree that access to lending and financial education create opportunities that enhance the financial futures of individuals, families and communities. Thus, the Banks have voluntarily entered into this agreed-upon Consent Order, which will avoid the costs and burdens of litigation and allow the Banks to further focus their efforts on building strong communities.

**III.    TERMS OF ORDER**

**A.    Lending Practices**

1. The Banks, including all of their officers, employees, agents, representatives, assignees, and successors in interest, and all those in active concert or participation with any of them, are hereby enjoined from engaging in any act or practice that discriminates on the basis of race or color that (a) violates the FHA in any aspect of a residential real estate-

3

related transaction, or (b) violates ECOA in any aspect of a credit transaction. Prohibited practices include, but are not limited to, those related to: marketing and advertising; the selection of sites for and the provision of services through branch offices or other channels; assignment, training, and monitoring of mortgage loan officers; and the determination of geographic areas in which loan applications are solicited or funded, except to address the violations alleged by the United States.

2. The Banks shall take the actions that are necessary to ensure that they offer and provide all persons with an equal opportunity to apply for and obtain credit, regardless of the racial composition of the area in which a person lives, or the area in which the property securing the loan is located. Those actions include, but are not limited to, the actions specified in the Order.

3. The Banks shall take all reasonable, practicable steps consistent with safety and soundness, including, but not limited to, those specified below, to make all types of residential loan products it offers available in, and market them in, majority-African-American census tracts on no less favorable a basis than in the majority-white census tracts so that all persons will have an equal opportunity to access and obtain credit from the Banks. Nothing in the Order requires either Bank to make unsafe or unsound loans or requires loans to be originated or priced based upon the race of the borrower or prospective borrower.

4. The Banks retain the discretion to take any additional actions they believe are appropriate to achieve the goals of the Order and shall include information about such actions in their reporting under Paragraph 41.[1]

---

[1] All material required by the Order to be sent to the United States shall be sent by commercial overnight delivery service addressed as follows: Chief, Housing and Civil Enforcement Section, Civil Rights Division, U.S.

4

5.  For purposes of the Order, Union's "lending area" consists of: Butler, Clermont, Hamilton and Warren counties within the Cincinnati-Middleton, Ohio MSA; Delaware, Fairfield and Franklin Counties within the Columbus, Ohio MSA; Greene, Miami and Montgomery Counties within the Dayton, Ohio MSA; and Hamilton and Marion Counties within the Indianapolis-Carmel, Indiana MSA. Guardian's "lending area" consists of Butler, Clermont, and Hamilton Counties in Ohio; and Boone, Campbell and Kenton Counties in Kentucky.

6.  For purposes of the Order, any census tract in which African-Americans constituted more than 50% of the population at the time of the 2010 Census is considered a "majority-African-American census tract," and any census tract in which non-Hispanic whites constituted more than 50% of the population at the time of the 2010 Census is considered a "majority-white census tract."

**B.    <u>Fair Lending Compliance and Training</u>**

7.  Within 60 days of the entry of the Order ("Effective Date"), the Banks must identify an independent third-party compliance-management-system consultant ("CMS Consultant"), subject to the United States' Non-objection[2], to assist in the review and revision, as necessary, of the Banks' policies and practices designed to ensure their compliance with fair lending laws as they relate to making available and marketing products in majority-

---

Department of Justice, 1800 G Street NW, Suite 7002, Washington, DC 20006, Attn: DJ 188-58-13, or by e-mail to the DOJ attorney assigned to this matter.

[2] "Non-objection" means written notification to the Banks that there is not an objection to a proposal by the Banks for a course of action. The United States will endeavor to direct revisions or provide a Non-objection within 30 days of the submission of a proposal. In the event of an objection to a proposal, the Banks will make all revisions directed by the United States and resubmit the proposal for Non-objection within 14 days. Unless otherwise specified below, the Banks will begin implementation of the course of action and follow any steps, recommendations, deadlines, and timeframes within 14 days of notification of the Non-objection. Any material changes to the course of action cannot be made without the Banks obtaining written notification that there is not an objection to the proposed change.

African-American census tracts. The Banks may select the same CMS Consultant. Within 20 days of the Non-objection to the selection of the CMS Consultant, the Banks must enter into a contract with the CMS Consultant, requiring the CMS Consultant to conduct a detailed assessment of the Banks' policies and practices that are relevant to ensuring that the Banks comply with ECOA and the FHA as they relate to making available and marketing products in majority-African-American census tracts, including at a minimum policies and practices related to: branch locations; loan officers' solicitation of applications, including the geography covered by loan officers; product availability at branch locations; loan officers' assignment, training, oversight, and compensation; marketing; and fair lending compliance monitoring.

8. Within 120 days of the Banks' engagement of the CMS Consultant, the Banks must submit to the United States a detailed written report by the CMS Consultant describing any recommended improvements to the Banks' policies and practices that are relevant to ensuring that the Banks comply with ECOA and the FHA making available and marketing products in majority-African-American census tracts. The recommended improvements must include a program for ongoing fair lending statistical monitoring of loan applications and originations, including statistical peer analysis of applications and originations from majority-African-American census tracts.

9. Within 60 days of the Banks' submission of the CMS Consultant's written report pursuant to Paragraph 8, the Banks will submit written confirmation to the United States, subject to Non-objection by the United States, regarding which of the CMS Consultant's recommendations the Banks will adopt or implement, as well as the Banks' plans regarding when and how they intend to adopt or implement those recommendations. To

the extent that a CMS Consultant's recommendation will not be adopted or implemented, the Banks will explain their reasoning to the United States.

10. Within 180 days of the Effective Date, the Banks will provide training to all employees with significant involvement in mortgage lending within their lending areas ("Covered Employees") to ensure that their activities are conducted in a nondiscriminatory manner. This training will address the Banks' obligations under the ECOA and FHA and the Banks' responsibilities under the Order. The training must require employees to verify participation and demonstrate proficiency. The Banks will provide this fair lending training annually to Covered Employees. The Banks may retain an independent qualified third-party to conduct the training. In addition to the training for Covered Employees described in this Paragraph, the Banks' senior management who participate in lending, branching, or marketing within the Banks' lending areas, and the Banks' Boards of Directors will receive specialized training targeted to their oversight functions. The selection of any independent qualified third-party and the proposed training curriculum will be subject to the Non-objection of the United States. The Banks will bear all costs associated with the training.

11. Within 30 days of the Effective Date, the Banks will provide to all Covered Employees, members of senior management identified in Paragraph 10, and members of the Board of Directors copies of the Order, and allow an opportunity for such employees and members to have any questions concerning the Order answered.

12. The Banks will secure from each Covered Employee, member of senior management identified in Paragraph 10, and member of the Board of Directors a signed statement acknowledging that (s)he has received a copy of the Order and has completed the fair

lending training. These statements will be substantially in the form of Appendix A (Acknowledgment) and Appendix B (Fair Lending Training).

13. The Banks will provide each individual who becomes a Covered Employee, member of senior management identified in Paragraph 10, or member of the Board of Directors a copy of the Order, provide an opportunity to have any questions answered, and secure a signed acknowledgement no later than 10 business days after the individual becomes a Covered Employee, member of senior management, or member of the Board of Directors.  The Banks will further provide each such individual with the training referenced in Paragraph 10 and secure a signed acknowledgment within 60 days of his/her hire.

**C.**     **Credit Needs Assessment**

14. The Banks will prepare an assessment of the credit needs of majority-African-American census tracts within their lending areas.  This credit needs assessment will include at a minimum: (a) an analysis of the most recent available demographic and socioeconomic data about the majority-African-American census tracts in the Banks' lending areas; (b) an evaluation (to include market research and interviews) of the credit needs of, and corresponding lending opportunities in, these neighborhoods, including, but not limited to, the need for and feasibility of alternative mortgage and other credit products; (c) in-person marketing visits with the Banks' mortgage loan officers to discuss product offerings, competition, and the viability of obtaining more applications from these neighborhoods; (d) a review of affordable loan products offered by other lenders, and an evaluation of how the development of an affordable portfolio loan product that incorporates features adopted by other lenders would assist in achieving the goals of the Order; (e) a review of the Banks' participation in relevant federal, state, and local

8

governmental programs, the availability and feasibility of relevant programs in which the Banks do not already participate, and an evaluation of how increased or new participation in each of them would assist in achieving the goals of the Order; and (f) consideration of how the Banks' lending operations can be expanded to serve the goals of the Order. As part of developing the credit needs assessment, the Banks will meet with representatives of community organizations significantly involved in promoting fair lending, home ownership, or residential development in affected majority-African-American census tracts in the Banks' lending areas.

15. Within 180 days of the entry of the Order, the Banks will jointly submit to the United States a written report ("CNA Report") outlining the Banks' findings with regard to their assessment of credit needs of majority-African-American census tracts within their lending areas and containing the Banks' proposals to address how best to achieve the goals of the Order in light of their findings, including specific timeframes and deadlines for these actions. The Banks' proposals pursuant to this Paragraph will be subject to the United States' Non-objection.

**D.** **Director of Community Development**

16. The Banks already have designated a full-time Director of Community Development. For the duration of the Order, the Banks shall continue to jointly employ a full-time Director of Community Development, whose primary responsibilities will include overseeing the continued development of the Banks' lending in majority-African-American census tracts. The Director of Community Development will continue to be a member of management and make regular reports directly to the Boards of Directors regarding the following responsibilities: monitoring the activities of loan officers regarding the solicitation and origination of loans in majority-African-American census

9

tracts, including the special loan programs identified in the Order; coordinating the Banks' involvement in community lending initiatives and outreach programs, serving as a resource to lending staff to encourage and develop more lending within majority-African-American census tracts; promoting financial education; providing financial counseling; and building relationships with community groups.

**E.**     **Physical Expansion to Serve African-American Populations**

17. Subject to any applicable approval of the appropriate regulator, Union will open two new full-service branches located in majority-African-American census tracts in Union's lending area.  Union intends to open those two branches as follows: (1) Cobblewood Plaza on Smiley Avenue in Forest Park, Ohio (part of the Cincinnati lending area), and (2) 100 E. Market Street in Xenia Ohio (part of the Dayton lending area).  These branches are in retail-oriented spaces in visible locations accessible to concentrations of owner-occupied residential properties in the majority-African-American census tracts in Union's lending area.  Each such new branch will provide the complete range of services typically offered at Union's full-service branches and will accept first-lien mortgage loan applications.

18. Subject to any applicable approval of its appropriate regulator, Guardian will open one loan production office.  Guardian intends to open that loan production office at 2820 Vernon Place, in Cincinnati, Ohio.  Guardian will advertise this location in a manner similar to which it advertises its other branches and will provide signage visible from the public way indicating the location of this loan production office.  Guardian will also maintain regular business hours during which members of the public can access loan services at this loan production office.

19. Union and Guardian will make all reasonable efforts to open the branches and the loan production office as discussed in Paragraphs 17-18 within 18 months of the Effective Date. If either of the branches or the loan production office have not been opened or acquired, or otherwise fail to meet the requirements of Paragraphs 17-18 within 18 months, the Banks will provide a written proposal subject to the United States' Non-objection setting forth in detail the steps to be taken to comply with Paragraphs 17-18.

20. Nothing in the Order precludes the Banks from opening or acquiring additional branch offices or loan production offices. The Banks will evaluate future opportunities for expansion within their lending areas, whether by acquisition or opening new offices, in a manner consistent with achieving the goals of the Order. Each Bank must notify the United States of any plans to open or acquire any new branches or other offices within its lending areas at the same time that it notifies its regulator(s) so that the United States may raise any concerns with the respective Bank and its regulator(s) before regulatory approval is granted. If the United States has any concern, it will also raise it directly with the Bank.

21. Within 180 days of the Effective Date, each Bank will ensure that not less than two percent of its mortgage loan officers, and in any event not less than four mortgage loan officers total, are assigned to solicit applications from majority-African-American census tracts within its lending areas. The Banks will assign such loan officers so as to cover all majority-African-American census tracts within their lending areas. The Banks will ensure these loan officers have the opportunity to earn similar compensation to other loan officers.

**F.** **Community Development Partnership Program**

22. The Banks will partner with one or more community-based organizations or governmental organizations to provide the residents of majority-African-American census tracts in their lending areas with (1) home repair or other grants designed to assist homeowners who experience financial distress or deferred maintenance on their properties, (2) credit, financial, homeownership, or foreclosure prevention services, or (3) provide low- or no-cost access to home ownership. The Banks will develop such partnerships in a manner consistent with achieving the goals of the Order; specifically, they will form partnerships with organizations that will aid in marketing their residential loan products in majority-African-American census tracts in their lending areas; extending credit to qualified borrowers in majority-African-American census tracts in their lending areas; and assisting with the revitalization and stabilization of the housing market in majority-African-American census tracts in their lending areas. Union and Guardian collectively must spend a minimum of $750,000 over the term of the Order on these partnerships.

23. Within 180 days of the entry of the Order, the Banks will jointly submit a proposal to the United States for how they will implement the requirements of Paragraph 22. The proposal will include an explanation of their selection of the proposed partner(s). The proposal should also describe, to the extent available, their plans to implement the partnership(s). This proposal will be subject to Non-objection by the United States.

24. The Banks will annually evaluate the partnership(s) outlined in Paragraph 23, in order to identify any required changes to the program to better assist residents of majority-African-American census tracts in obtaining credit. The Banks will present a summary of their evaluation and any proposed changes to the United States as part of their annual

reporting requirement pursuant to Paragraph 41. Any proposed changes will be subject to Non-objection by the United States.

**G.**     **Advertising and Outreach**

25. The Banks will advertise and conduct outreach within majority-African-American census tracts. Under this Order, the Banks' advertising and outreach will endeavor to effectively advertise the Loan Subsidy Program, and will be targeted to generate applications for mortgage loans from qualified residents in majority-African-American census tracts in the Banks' lending areas. This advertising and outreach shall include, at a minimum, the following components:

(a)     Print Media.   During each year of the Order, in addition to any other print advertising, each Bank shall advertise or continue to advertise, individually or jointly, in at least one print medium specifically directed to African-American readers distributed in each of the MSAs in their lending areas. These advertisements shall include similar information to that contained in other print media by the Banks and also shall include the addresses and phone numbers of branches located closest to majority-African-American census tracts in the target market. The Banks retain the discretion to determine the size, content, and frequency of such advertising subject to the standards set forth above.

(b)     Radio.   During the term of the Order, in the event that the Banks use radio advertising for any purpose, the Banks shall place radio advertisements on at least one African-American-oriented radio station serving the applicable lending area. The radio advertising shall contain information that is similar to the information contained in the other radio advertisements. The Banks retain the discretion to determine the content and frequency of such radio spots subject to the standards set forth above and to place such advertising on additional relevant stations.

13

(c) <u>Internet.</u> During the term of the Order, in the event that Union uses Internet or web-based targeted internet advertising, the Banks shall ensure such advertisements reach the majority-African-American tracts within their lending areas. The Internet or web-based advertising shall contain information similar to that in the Banks' other targeted internet or web-based advertising. The Banks retain the discretion to determine the content and frequency of such advertisements subject to the standards set forth above.

(d) <u>Promotional Materials</u>. The Banks shall create point-of-distribution materials, such as posters and brochures, targeted toward the majority-African-American census tracts to advertise products and services, including any special loan products or services, made available pursuant to the Order. The Banks shall place or display these promotional materials in their branch offices, loan production offices, and additional appropriate distribution locations throughout the majority-African-American census tracts within their lending areas.

(e) <u>Direct Mailings</u>. The Banks also may utilize direct mailing targeted to residents in majority-African-American census tracts.

(f) All of the Banks' print advertising and promotional materials referencing mortgage loans shall contain an equal housing opportunity logotype, slogan, or statement. All radio and television advertisements shall include the audible statement "Equal Opportunity Lender" or "Equal Housing Lender."

26. The Banks shall also provide for quarterly outreach programs during the term of the Order for real estate brokers and agents, developers, and public or private entities engaged in residential real estate related business in majority-African-American census tracts to inform them of the products and services offered, including those detailed in the

14

Order, and to otherwise develop business relationships with them. These programs shall be offered at locations reasonably convenient to the business operations of the attendees.

27. The Banks shall also provide for quarterly outreach seminars during the term of the Order targeted toward residents in majority-African-American census tracts in the Banks' lending areas. These seminars shall cover credit counseling, financial literacy, and other related educational programs, to help identify and develop qualified loan applicants from these areas.

28. The Banks also may underwrite or sponsor not-for-profit events in support of the African-American communities in their lending areas that are related to building relationships within the African-American census tracts in the Banks' lending areas and designed to generate applications for home mortgages.

29. The Banks shall spend a minimum of $625,000 over the term of the Order (at least $125,000 per year) on the advertising and outreach activities described in Section G.

**H.** **Consumer Financial Education and Credit Repair**

30. The Parties agree that assisting residents of the affected census tracts in maintaining and improving their consumer credit scores is essential to the goals of the Order. The consumer financial education and credit repair program shall help identify and develop qualified loan applicants from majority-African-American census tracts in the Banks' lending areas. The Banks shall spend a minimum of $625,000 over the term of the Order (at least $125,000 per year) on one or more components of the following consumer education and credit repair program. Those components, from which the Banks may select, include:

(a) Financial Education: Sponsoring a minimum of 12 financial education events per year offered by community and governmental organizations engaged in fair lending

15

work, or through the Banks' own financial education programs.[3] These financial education events shall be marketed towards residents of all majority-African-American census tracts the Banks' lending areas, and held in locations intended to be convenient to those residents.

(b) Credit Establishment and Repair: Providing one or more of the following forms of credit establishment and repair assistance to residents of majority-African-American census tracts in the Banks' lending areas:

(1) Financial support to HUD-approved financial education counselors who provide services targeted towards majority-African-American census tracts, up to an aggregate annual contribution of $80,000 per year for all partner organizations to offset the organizations' direct cost of financial counseling services;

(2) Debt forgiveness (including unpaid principal, interest, escrow payments and/or fees) up to $15,000 per loan (but not to exceed 90% of the total amount owed) for borrowers or co-borrowers residing in a majority-African-American census tract who experience difficulty repaying any residential or consumer loan originated by the Banks that has an original principal amount of less than $500,000 and for whom the debt forgiveness provides a realistic opportunity to return the loan to good standing for its remaining term;

(3) Other related programs intended to help establish or remediate consumer credit that are targeted at the residents of majority-African-American census tracts in the Banks' lending areas, as may be proposed during the term of the Order by the Banks and obtain the Non-objection of the United States prior to implementation.

---

[3] Salaries or other compensation for participating Bank personnel shall not be counted towards the amount spent on these programs.

31. The consumer education and credit repair programs will be marketed in a manner that includes all of the majority-African-American census tracts in the Banks' lending areas so that all eligible residents of these areas have an opportunity to participate. Each individual marketing effort is not required to reach every majority-African-American census tract in a lending area.

## I.  **Program for Loan Subsidies**

32. The Banks will invest a minimum of Seven Million Dollars ($7,000,000) in a program to increase the credit that the Banks extend to residents of majority-African-American census tracts in their lending areas ("Loan Subsidy Program"). At least $1,000,000 must be invested through the Loan Subsidy Program in each MSA in Union's and Guardian's lending areas. The Loan Subsidy Program will offer residents of, and small businesses operating in, majority-African-American census tracts in their lending areas loans on a more affordable basis than otherwise available from the Banks.[4]

33. Under the Loan Subsidy Program, the Banks will subsidize loans made to "qualified applicants." A "qualified applicant" for a residential loan is any applicant who: (a) qualifies for a residential mortgage loan under the individual Bank's underwriting standards; and (b) applies for a mortgage loan for a residential property located in a majority-African-American census tract in the individual Bank's lending area that will serve as the borrower's primary residence. A "qualified applicant" for a small business loan is any applicant who: (a) qualifies for a small business loan under the Bank's underwriting standards; and (b) operates a business that is wholly or predominantly located in a majority African-American census tract; and (c) applied for a business loan.

---

[4] No residential loan originated under this program shall exceed the conforming loan limit applicable to Fannie Mae and Freddie Mac.

34. Under the Loan Subsidy Program, the Banks may provide in their sole discretion one or more of the following forms of financial assistance to any qualified applicant, to be provided directly by the Banks under paragraphs (a) and (h), and either directly by the Banks and/or through a grant made to a qualifying community organization[5] under paragraphs (b), (c), (d), (e), (f), (g) and (i):

(a)     originating or brokering a loan for a home purchase, home refinancing, or home improvement at an interest rate that is 0.5 to 1 percentage point (50 - 100 basis points) below the APR that is published the date that the loan is locked-in;

(b)     providing a grant of a minimum of $500 and a maximum of $15,000, for the purpose of downpayment assistance for residential loans;

(c)     providing closing cost assistance[6] in the form of a grant of a minimum of $500 and a maximum of $15,000 for residential loans;

(d)     providing down payment or closing cost assistance through a second mortgage that provides for principal forgiveness of a minimum of $500 and a maximum of $15,000 based on loan performance during the term of the Order for residential loans;

(e)     providing the amount required to fund a qualified applicant's escrow account at closing for residential loans, of a minimum of $500 and a maximum of $15,000, in the form of a grant;

(f)     purchasing interest free mortgage loans originated by a qualifying community organization that builds affordable housing for families in the Banks' lending areas who

---

[5] A "qualifying community organization" is defined as a non-profit organization that has among its goals the furtherance of affordable and/or fair housing in majority-African-American census tracts in the Banks' lending areas.

[6] Closing cost assistance may include the waiver of standard application and processing fees assessed in connection with residential mortgage loan applications (*e.g.*, application fee, loan origination or underwriting fee, processing fee, appraisal fee, home inspection fee, flood determination fee, and title fees).

are in need of shelter, or originating mortgage loans to qualified applicants under a special purpose credit program to purchase homes built by such a qualifying community organization, under the following circumstances: (i) the residence is located in a majority-African-American census tract; (ii) the amount of the subsidy is calculated by determining the interest that would have been paid had the loan been originated by the Bank at 100 basis points below APR that is published the date that the loan is locked-in, but in any event a subsidy shall not to exceed $15,000; and (iii) the aggregate amount of credit under the Loan Subsidy Program for such loans does not exceed $500,000;

(g)      providing grant funds to qualifying community organizations for the establishment of "cash reserve repair fund" accounts for residential loans. These pre-paid savings accounts will be opened at the Banks by the qualifying community organization for the benefit of the homeowner and, subject to approval by the qualifying community organization administering the account, may be used for home repair and maintenance expenses or if a qualifying life emergency[7] prevents the homeowner from making his or her mortgage payments. The homeowner will receive up to $3,500 in the pre-paid savings account and the qualifying community organization will receive up to a $500 administrative fee (but no more than 15% of the amount placed into the savings account) from the grant funds provided by the Banks, for a total grant of up to $4,000 per homeowner. The term of these accounts is three years, after which time any remaining money will be transferred to the homeowner;

(h) originating or brokering a small business loan to a qualified applicant at an interest rate up to one (1) percentage point (100 basis points) below the prevailing APR. No

---

[7] A "qualifying life emergency" includes, but is not limited to, unexpected health expenses, automobile repairs, home repairs, temporary unemployment or other expenses or emergencies approved by the non-profit organization or qualifying community organization that temporarily impairs a homeowner's ability to make mortgage payments.

more than $1 million of the loan subsidy fund may be used to subsidize small business loans; and

(i) other means subject to Non-objection by the United States.

35. The Banks retain the discretion to offer more than one, or all, of the foregoing forms of financial assistance to qualified applicants on an individual basis as they deem appropriate under the factual circumstances of a particular application. The Banks will exercise this discretion in a manner which maximizes the likelihood that it will originate a loan to a qualified applicant consistent with applicable underwriting guidelines and safety and soundness standards, and will have discretion to provide the loan subsidy among their loan products.

36. No qualified applicant may receive a total subsidy greater than $15,000.

37. The loan subsidy program will be marketed in a manner that does not exclude any of the majority-African-American census tracts so that all eligible residents the Banks' lending areas have an opportunity to participate.

38. No provision of the Order, including any loan subsidy or equivalent program, requires the Banks to make any unsafe or unsound loan or to make a loan to a person who is not qualified for the loan based upon lawful, nondiscriminatory terms; however, the Banks may choose to apply more flexible underwriting standards in connection with the programs under the Order, so long as those standards comport with safe and sound lending practices. In addition, the Banks' underwriting standards applied to residents of majority-African-American census tracts must be no less favorable than the standards that are applied in majority-white census tracts. At the same time, no provision of the Order imposes an obligation on the Banks to apply underwriting standards to applicants

20

that qualify for the loan subsidy program that are more favorable than the standards otherwise applied by the Banks.

## IV.    EVALUATING AND MONITORING COMPLIANCE

39. For the term of the Order, the Banks shall retain their records relating to their obligations hereunder, including lending activities, as well as advertising, outreach, branching, special programs, and other compliance activities as set forth herein.  The United States shall have the right to review and copy such records upon request.

40. The Banks shall provide to counsel for the United States the data they submit to the Federal Financial Institutions Examination Council ("FFIEC") pursuant to the Home Mortgage Disclosure Act.  The data will be provided in the same format in which it is presented to the FFIEC within 30 days of its submission to the FFIEC each year for the term of the Order, including the record layout.  The United States will utilize the data to monitor compliance with the Order.

41. In addition to the submission of any other plans or reports specified in the Order, each Bank shall make an annual report to the United States on its progress in fulfilling the goals of the Order.  Each such report shall provide a complete account of the Bank's actions to comply with each requirement of the Order during the previous year, the Bank's objective assessment of the extent to which each quantifiable obligation was met, an explanation of why any particular component fell short of meeting the goal for that year, and any recommendations for additional actions to achieve the goals of the Order including the Community Development Partnership Program in Section F, above.  Each Bank's Board of Directors shall review and approve its report, and each Bank shall submit its report each year for the term of the Order within 60 days after the anniversary of the Effective Date.   In addition, each Bank shall attach to its annual reports

representative copies of training material and advertising and marketing materials disseminated pursuant to the Order. The United States will review each report submitted and will have 30 days to raise any objections to it, and if it raises any, the parties shall confer to resolve their differences. In the event they are unable to do so, either party may bring the dispute to the Court for resolution.

## V.    ADMINISTRATION

42. The requirements of the Order shall be in effect for five years and three months, except as specified in Paragraphs 44 and 45.

43. The United States agrees, to the extent possible, to assess the progress by each Bank individually.

44. If, within five years of the Effective Date, the Banks have not invested all money in the Loan Subsidy Program, the Order shall terminate three months after the submission of each Bank's final report to the United States that demonstrates the fulfillment of that obligation. It shall only be extended further upon motion of the United States to the Court, for good cause shown.

45. If, at any time after three years from the Effective Date, the Banks have invested all money in the Loan Subsidy Program and satisfied their other financial obligations under the Order (set forth in Paragraphs 22, 29, and 30), the United States will agree to the Order terminating three months after the Banks have provided the United States with documentation evidencing that they have satisfied their financial obligations under this Order.

46. Any time limits for performance fixed by the Order may be extended by mutual written agreement of the parties. Other modifications to the Order may be made only upon approval of the Court, by motion by either party. The parties recognize that there may be

changes in relevant and material factual circumstances during the term of the Order that may impact the accomplishment of its goals. The parties agree to work cooperatively to discuss and attempt to agree upon any proposed modifications to the Order resulting therefrom.

47. In the event that any disputes arise about the interpretation of or compliance with the terms of the Order, the parties shall endeavor in good faith to resolve any such dispute between themselves before bringing it to the Court for resolution. The United States agrees that if it reasonably believes that a Bank has violated any provision of the Order, it will provide the Bank written notice thereof and give it 30 days to resolve the alleged violation before presenting the matter to the Court. In the event of either a failure by the Bank to perform in a timely manner any act required by the Order or an act by a Bank in violation of any provision hereof, the United States may move the Court to impose any remedy authorized by law or equity, including attorneys' fees and costs.

48. Nothing in the Order shall excuse a Bank's compliance with any currently or subsequently effective provision of law or order of a regulator with authority over the Bank that imposes additional obligations on it.

49. The Order shall be binding on each Bank, including all its officers, employees, assignees, and successors in interest, and all those in active concert or participation with any of them in the origination of loans. In the event a Bank seeks to transfer or assign all or part of its operations, and the successor or assign intends on carrying on the same or similar use, as a condition of sale, the Bank shall obtain the written accession of the successor or assign to any obligations remaining under the Order for its remaining term.

50. The parties agree that, as of the Effective Date, litigation is not "reasonably foreseeable" concerning the matters described above. To the extent that any party previously implemented a litigation hold to preserve documents, electronically stored information, or things related to the matters described above, the party is no longer required to maintain such litigation hold. Nothing in this paragraph relieves the parties of any other obligations imposed by the Order.

51. A Bank's compliance with the terms of the Order shall fully and finally resolve all claims of the United States relating to that Bank's alleged violation of the fair lending laws as alleged in the United States' Complaint in this case, including all claims for equitable relief and monetary damages and penalties. The Order does not release claims for practices not addressed in the Complaint's allegations, including claims that may be held or are currently under investigation by any federal agency, or any claims that may be pursued or actions that may be taken by any executive agency established by 12 U.S.C. § 5491 or the appropriate Federal Banking Agency, as defined in 12 U.S.C. § 1813(q), against either Bank, any of its affiliated entities, and/or any institution-affiliated party of it, as defined in 12 U.S.C. § 1813(u), pursuant to 12 U.S.C. § 1818 or any other statute or regulation. The Order does not resolve and does not release claims other than claims for discrimination.

52. The parties to the Order shall bear their own costs and attorney's fees associated with this litigation.

53. The Court shall retain jurisdiction for the duration of the Order to enforce its terms, after which time the case shall be dismissed with prejudice.

SO ORDERED, this ___ day of _____, 201_.


_____
UNITED STATES DISTRICT JUDGE

The undersigned hereby apply for and consent to the entry of the Order:

**For the United States**:

BENJAMIN C. GLASSMAN
United States Attorney
Southern District of Ohio

*/s/Matthew J. Horwitz*
Matthew J. Horwitz (0082381)
Assistant U.S. Attorney
United States Attorney's Office
Southern District of Ohio
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45205
Tel: (513) 684-3711
Matthew.Horwitz@usdoj.gov

*/s/ Vanita Gupta*
VANITA GUPTA
Principal Deputy Assistant Attorney General
Civil Rights Division

*/s/ Sameena Shibna Majeed*
SAMEENA SHINA MAJEED
Chief, Housing and Civil
Enforcement Section
Civil Rights Division

*/s/ Sara L. Niles*
DANIEL A. MOSTELLER
Acting Special Litigation Counsel
SARA L. NILES
Trial Attorney
United States Department of Justice
Civil Rights Division
Housing and Civil Enforcement Section
950 Pennsylvania Avenue, N.W.- NWB
Washington, DC 20530
Tel.: (202) 514-2168
Sara.Niles@usdoj.gov

**For Union Savings Bank**:


*/s/ Lisa M. Krigsten_____*
LISA M. KRIGSTEN
Dentons US LLP
4520 Main Street, Suite 1100
Kansas City, Missouri 64111
Tel.:  (816) 460-2554
Lisa.Krigsten@dentons.com


*/s/ Jeanne M. Cors_____*
RALPH W. KOHNEN (0034418)
JEANNE M. CORS (0070660)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
Tel: (513) 357-9618
Kohnen@taftlaw.com



**For Guardian Savings Bank**:


*/s/ Lisa M. Krigsten _____*
LISA M. KRIGSTEN
Dentons US LLP
4520 Main Street, Suite 1100
Kansas City, Missouri 64111
Tel.:  (816) 460-2554
Lisa.Krigsten@dentons.com


*/s/ Jeanne M. Cors_____*
RALPH W. KOHNEN (0034418)
JEANNE M. CORS (0070660)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
Tel: (513) 357-9618
Kohnen@taftlaw.com

## <u>Appendix A</u>

I hereby acknowledge that I have received and read a copy of the Consent Order entered in United States v. Union Savings Bank and Guardian Savings Bank. I have had the opportunity to ask questions and obtain answers to them and I understand my fair lending obligations under the Order.

_____
[Signature]

_____
[Print Name]

_____
[Job Title]

_____
[Date]

**<u>Appendix B</u>**

I hereby acknowledge that on _____, I attended the fair lending training program provided to [Union Savings Bank or Guardian Savings Bank]employees by _____, During the training, I received information about my fair lending obligations under the terms of the Consent Order entered by the court in <u>United States v. Union Savings Bank and Guardian Savings Bank</u>, [Union or Guardian] Savings Bank's current policies, and relevant federal, state, and local laws.  I had the opportunity to ask questions and to receive answers to them.  I understand my fair lending obligations under that Order, [Union or Guardian] Savings Bank's policies, and those laws.

_____
[Signature]

_____
[Print Name]

_____
[Job Title]

_____
[Date]

29